IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

JAMES CHAVIS-TUCKER,                              CASE NO. 2:06-cv-1064

     Petitioner,                              JUDGE SMITH
                                         MAGISTRATE JUDGE KING

v.

STUART HUDSON, Warden,

     Respondent.


## REPORT AND RECOMMENDATION

Petitioner, a state prisoner, brings the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This matter is before the Court on the instant petition, respondent's return of writ, petitioner's traverse, and the exhibits of the parties. For the reasons that follow, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED**.

### FACTS AND PROCEDURAL HISTORY

The Ohio Tenth District Court of Appeals summarized the facts and procedural history of this case as follows:

> On April 11, 1992, a complaint was filed in the Franklin County Municipal Court, charging defendant with murder in violation of R.C. 2903.02. The charge arose in connection with the drive-by shooting death of Ernest Penn, III, who was a security guard at Club Alexander's, a nightclub in Columbus. A warrant was issued for defendant's arrest. Defendant was eventually apprehended in Nevada in 1993. On October 19, 1994, defendant waived extradition and consented to return to Ohio to face the murder charge; the order of extradition filed by the Nevada authorities was stayed until the local charges pending against defendant were resolved.
>
> On February 23, 1995, defendant was indicted on one count of aggravated murder in violation of R.C. 2903.01(A) with a firearm specification under R.C. 2941.141, and one count of having a weapon

under disability in violation of R.C. 2923.13 with a prior offense of violence specification under R.C. 2941.143. The charges in the indictment stemmed from the same conduct which gave rise to the April 11, 1992 murder complaint.

Defendant was returned to Columbus, Ohio, on May 31, 1995. The murder complaint pending in Franklin County Municipal Court was dismissed at the state's request on October 16, 1995. Pursuant to defendant's November 3, 1995 request under Crim.R. 14, defendant was tried separately for the first and second counts of the indictment.

Prior to his trial, defendant moved to dismiss the charges against him on speedy trial/double jeopardy grounds. Although defendant acknowledged he waived his right to a speedy trial on the charges listed in the indictment, he insisted he did not waive his speedy trial rights on the murder complaint filed in municipal court. Because the state did not move to dismiss the murder complaint within ninety days of his return to Ohio, defendant asserted the speedy trial limit set forth in R.C. 2945.71 had elapsed on the murder charge. Defendant further contended he was entitled to have the aggravated murder indictment dismissed as well, since any subsequent prosecution for the events of April 11, 1992 would be barred on double jeopardy grounds. After taking testimony and hearing oral arguments on the issue, the trial court deferred ruling on defendant's speedy trial/double jeopardy motion until after trial.

As a result of a trial held on the aggravated murder charge, the jury convicted defendant of aggravated murder and the accompanying firearm specification. Following the trial, the trial court overruled defendant's speedy trial/double jeopardy motion and his Crim.R. 29 motion, and sentenced defendant accordingly.

***

In the late evening of April 10 or the early morning of April 11, 1992, Darrell Strickland was on the dance floor of Club Alexander's when defendant elbowed him; Strickland, who was there with his cousin Nathan Howard, asked defendant if he had a problem. Defendant responded by spitting at Strickland, and Strickland spit back at defendant. Defendant then hit Strickland and a fight ensued. Strickland testified defendant appeared to be intoxicated at the time of the fight. Although Strickland characterized the fight as "a minor altercation" (Tr. 423), Howard described the fight as one where "fists

2

[were] flying" and the participants were wrestling with one another. (Tr. 51.) A number of security guards at Club Alexander's broke up the fight and escorted defendant and Strickland to the front of the nightclub. Defendant and Strickland started fighting again at the front of the bar, and the two had to be separated once more. At that time, a security guard took a picture of defendant, introduced as State's Exhibit 3-A, to alert any employee who was not present that night that defendant was barred from returning to Club Alexander's.

Several security guards, including Doyle Banks, escorted defendant out of Club Alexander's. As Banks watched defendant walk to his car, he not only saw defendant shove another customer out of his way, but also observed defendant become angry on seeing a sticker had been placed on his windshield. Noting defendant appeared to be intoxicated at the time, Banks watched defendant, and a woman who was with defendant, get into an automobile and leave the parking lot. Although Banks could not see at first who was driving, he noticed that as the two left the parking lot, the woman was driving.

After defendant had departed, several security guards, including Ernest Penn, escorted Strickland out of the nightclub. Penn stopped for a short time to talk to a woman he appeared to know. Strickland asked Penn if he knew where defendant was, and Penn replied that he did not. Penn then stated rather quickly "[t]here he is, get down." (Tr. 416.) Penn pushed Strickland down. Strickland heard two gunshots. He then saw an automobile as it was "screeching off." (Tr. 419.) Strickland was under the impression the shots came from the car, since "no other person came forward with a gun and no one was running from the scene with a gun." *Id.*

Steve Alexander, a security supervisor at Club Alexander's, testified he witnessed the fight between defendant and Strickland on the night in question. According to Alexander, when defendant left the nightclub, Alexander saw "a girl leaving right behind him that appeared to be with him." (Tr. 134.) After Penn and two other security guards escorted Strickland out of the nightclub, Alexander's supervisor, William Fowlkes, sent him out to tell the guards to come back inside, as the policy of Club Alexander was not to escort people outside. Once outside, Alexander noticed a car had pulled up; it had orange parking stickers on the windshield. Alexander was familiar with the stickers, since he had placed such stickers on several cars that night to tell the drivers they had parked improperly in Club Alexander's parking lot. One of the cars on which he had placed a parking sticker was a Dodge Dynasty, license tag number BOW 865.

As the car pulled up, Alexander first noticed a woman riding in the passenger seat, whom he was able to identify as Celeste Pankey, the woman he previously had seen leaving the nightclub with defendant. He then heard shots which sounded like they were coming from the car. Alexander could not see the driver because of the stickers.

Penn died as a result of a gunshot wound to his right eye. A .380 caliber bullet was later recovered from his body. A Dodge Dynasty, with a license tag number BOW 865 was found on or near a motel parking lot two or three days after the incident. Inside the car, the police found (1) a utility payment envelope with a return address to "Marie Chavis," (2) a temporary permit and driver's license application for "Jay Tucker," (3) a box of .380 caliber automatic ammunition, with the lettering "R-P" and "380 auto" on it, (4) two gold or bronze .380 caliber shell casings, and (5) one spent .380 caliber round. Expert examination of the two shell casings and one spent round revealed the two shell casings matched a shell casing found near a blue Mercury automobile at the scene of the shooting, and the one spent round was fired from the same gun that fired the bullet recovered from Penn.

In arguing the jury's verdict is not supported by sufficient evidence and is against the manifest weight of the evidence, defendant primarily argues the evidence demonstrates the bullet that killed Penn had to come from outside the Dodge Dynasty, not from inside it. In support of his contention, defendant notes that (1) the bullet that killed Penn was fired from the same gun that fired the bullet found in the rear floorboard of the Dodge Dynasty, (2) a silver .380 caliber shell casing with the lettering F.C. was found south of the front door of Club Alexander's where the shooting took place, and it did not match the two shell casings found in the Dodge Dynasty, (3) a bullet hole found in the roof of the Dodge Dynasty was flanged inward, showing the shot came from outside the car, not inside it, (4) bullet markings or holes were found inside the car above the passenger side, rear door window, (5) a muddy flat tire was found in the car's trunk, which may have been damaged by a bullet, and (6) a .45 caliber shell casing and a 9mm shell casing were recovered from the scene, which, along with the silver .380 shell casing, suggests an exchange of gunfire occurred that night. Finally, defendant claims the discrepancy in the testimony regarding the number of shots fired indicates the shots were fired from different directions. None of defendant's contentions are persuasive.

Neither the spent bullet found inside the Dodge Dynasty which

4

matched the bullet recovered from Penn, nor the bullet hole in the roof of the Dodge Dynasty, nor the bullet markings on the inside compel a reasonable jury to conclude the fatal shot came from outside the Dodge Dynasty; the jury reasonably could have concluded that evidence arose from different occasions. Additionally, the jury was not required to conclude the silver .380 caliber shell casing found outside the front door of Club Alexander's came from the bullet that killed Penn. Indeed, testimony that the silver casing was "dented" and "significantly more beat up" than the three bronze or gold .380 caliber shell casings suggested the silver shell casing had been at the scene for some time prior to the night of the shooting.

Further, although Sergeant Steve Kelley testified the car's tire was damaged "when the car drove off" (Tr. 390), and another witness suggested the tire damage shown in state's Exhibit 5-10 could have been caused by a bullet, no one testified they actually saw or heard any shots fired at the Dodge Dynasty; thus, the jury could have rejected the defense contention that someone shot the tire at the time of the murder. Moreover, the presence of the 9mm shell casing and .45 caliber shell casing at the murder scene need not have convinced a reasonable jury of an exchange of gunfire that night, as the testimony indicated other shootings had occurred at Club Alexander's in the past. Finally, the discrepancy in the number of shots heard does not compel a finding that more than one gun was being fired; Alexander testified to the highest number of shots heard, and he testified the shots appeared to come from the car he saw pull up to the nightclub.

Defendant also contends the jury was compelled to find reasonable doubt he was even in the car witnesses saw at the time Penn was shot. However, a bullet later found in the Dodge Dynasty was fired from the same gun that fired the bullet recovered from Penn. Although defendant tries to use that fact to his advantage, it actually ties the Dodge Dynasty to the murder scene, as do the two shell casings found in the car which were fired from the same gun that fired a shell casing found at the scene. Defendant, in turn, is tied to the Dodge Dynasty because of the utility payment envelope addressed to a "Marie Chavis" and the temporary permit and driver's license application for a "Jay Tucker," both of which were found in the car. Further, defendant is tied to the car from which the shots were fired because Pankey was first seen leaving the nightclub with him, and shortly thereafter as a passenger in the car from which the fatal shots were fired. Although Strickland testified he did not leave until approximately one-half hour after defendant did, which according to

5

defendant would have given Pankey ample time to get into another car, Alexander placed the interval between defendant's and Strickland's departure at three or four minutes; another security guard at Club Alexander's, Vanessa Simpkins, placed it at five or ten minutes.

In the end, the jury was to sort out inconsistencies in the testimony, such as whether defendant was a passenger or driver in the car as it left the parking lot of Club Alexander's, and whether the parking sticker was on the driver's side or the passenger side of the car from which the shots came. Similarly, the jury reasonably could choose not to give much weight to Strickland's testimony that the car from which the shots appeared to come had a brownish-grayish color, while the Dodge Dynasty was a gray, smoke-blue vehicle.

Finally, although Strickland testified that Penn said "[t]here he is, get down" just before he was shot, defendant contends the testimony is unreliable because as many as eight people were near the area where Penn was shot, but no one other than Strickland testified to the statement. While testimony revealed that Alexander was two steps behind Penn at the time of the shooting, the record does not indicate how far each of the other five to eight people were from Penn and Strickland at the time of the shooting. The failure of any other witness to testify to Penn's statement immediately before he was shot was a matter for the jury to weigh in determining the credibility of Strickland's testimony.

*State v. Chavis*, 1996 WL 737583 (Ohio App.10 Dist. December 26, 1996), *Exhibit 19 to Return of Writ.* Petitioner was convicted of aggravated murder, with a firearm specification. On March 11, 1996, he was sentenced to a term of imprisonment of 25 years to life, with an additional three year term on the firearm specification.

Represented by new counsel, petitioner filed a timely appeal. He raised the following assignments of error:

I. APPELLANT'S CONVICTION FOR AGGRAVATED MURDER WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND NOT SUPPORTED BY THE EVIDENCE WHEN THE STATE FAILED TO PROVE BEYOND A REASONABLE DOUBT

THE IDENTITY OF APPELLANT AS THE PERSON WHO COMMITTED THE CRIME.

II. APPELLANT WAS DENIED A FAIR TRIAL BY THE ADMISSION OF INADMISSIBLE PREJUDICIAL HEARSAY INCLUDING A STATEMENT PURPORTED TO BE MADE BY THE VICTIM 'THERE HE IS,' NON-VERBAL CONDUCT INTENDED AS AN ASSERTION OF IDENTITY THAT A [ *sic* ] UNKNOWN SECURITY GUARD HANDED A POLICE OFFICER A PICTURE OF APPELLANT WHEN ASKED TO IDENTIFY A MURDER SUSPECT, AND STATEMENTS BY UNKNOWN INDIVIDUALS TO A POLICE OFFICER THAT APPELLANT WAS A SUSPECT, TO ESTABLISH APPELLANT'S IDENTITY AS THE PERPETRATOR OF THE CRIME.

III. APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED UNDER THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION BECAUSE COUNSEL FAILED TO CALL TO THE STAND A DETECTIVE WHO INTERVIEWED THE ONLY WITNESS WHO CLAIMED TO HAVE HEARD THE VICTIM SAY 'THERE HE IS' BEFORE THE VICTIM WAS SHOT WHEN THE DETECTIVE'S INVESTIGATIVE SUMMARY INDICATED THAT THE WITNESS NEVER CLAIMED TO HAVE HEARD SUCH A STATEMENT, DEFENSE COUNSEL FAILED TO ASK IMPORTANT QUESTIONS ABOUT IDENTIFICATION TO [A] KEY STATE WITNESS WHO CLAIMED TO RECOGNIZE APPELLANT'S FEMALE COMPANION IN THE CAR IMMEDIATELY PRIOR TO THE SHOOTING, DEFENSE COUNSEL FAILED TO RENEW A REQUEST A [ *sic* ] FOR A CRIM.R. 16(B)(1)(g) HEARING AFTER THE PROSECUTOR REPRESENTED TO THE COURT THE POLICE DID NOT TAKE A STATEMENT FROM A WITNESS BUT THE WITNESS TESTIFIED THAT THE [ *sic* ] HE WAS INTERVIEWED EXTENSIVELY BY THE POLICE; DEFENSE COUNSEL FAILED TO OBJECT TO THE ADMISSION OF IMPERMISSIBLE HEARSAY TESTIMONY THAT A POTENTIAL SUSPECT WAS NOT PRESENT AT THE TIME OF THE SHOOTING, DEFENSE COUNSEL FAILED TO OBJECT TO INADMISSIBLE HEARSAY CONCERNING WHETHER ANY WITNESSES SAW TWO DIFFERENT PEOPLE FIRING GUNS AT CLUB ALEXANDER'S, DEFENSE COUNSEL FAILED TO OBJECT TO INCOMPLETE JURY INSTRUCTIONS CONCERNING IDENTIFICATION

WHEN KEY ISSUE IN THE CASE WAS IDENTIFICATION, AND DEFENSE COUNSEL FAILED TO INTERVIEW MOST OF THE STATE'S WITNESSES UNTIL THEY WERE ON THE WITNESS STAND.

IV. IN MURDER PROSECUTION, COMMENTS BY THE PROSECUTOR THAT THE TRAJECTORY OF A BULLET INDICATED THAT THE PERSON WHO SHOT AT THE DODGE DYNASTY ALSO COULD NOT HAVE SHOT THE VICTIM EVEN THOUGH THE SAME GUN PRODUCED THE SLUG FIRED INTO THE DODGE DYNASTY AND THE VICTIM AND COMMENTS BY THE PROSECUTOR THAT APPELLANT SHOT THE VICTIM BECAUSE HE WAS ANGRY AND BECAUSE HE WAS BELITTLED IN FRONT OF A GIRL THAT HE LIKES ARE IMPROPER IN CLOSING ARGUMENT WHEN THERE IS NO SUCH EVIDENCE IN THE RECORD. MISSTATING EVIDENCE IN CLOSING ARGUMENT DEPRIVED APPELLANT OF A FAIR TRIAL. APPELLANT ALSO FAILED TO RECEIVE A FAIR TRIAL BECAUSE THE PROSECUTOR CLAIMED THERE WERE NO CRIM.R. 16(B)(1)(g) STATEMENTS FOR DOYLE BANKS BUT DOYLE BANKS SAID HE WAS INTERVIEWED TWICE BY THE POLICE.

V. THE TRIAL COURT ERRED IN NOT DISMISSING THE CHARGE OF AGGRAVATED MURDER FOR VIOLATING APPELLANT'S RIGHT TO HAVE A SPEEDY TRIAL WITHIN 270 DAYS FROM THE TIME OF HIS ARREST WHEN APPELLANT WAS EXTRADITED BACK TO COLUMBUS ON AN AGGRAVATED MURDER CHARGE ON MAY 31, 1995, THE STATE INTENTIONALLY USED A COMPLAINT CHARGING HIM WITH AGGRAVATED MURDER [FN1] TO ARREST HIM AND KEEP HIM IN JAIL ON OCTOBER 13, 1995, EVEN THOUGH THE STATE WAS AWARE HE HAD ALREADY BEEN INDICTED ON THE SAME CHARGE ON FEBRUARY 23, 1995, AND THE COMPLAINT CHARGING HIM WITH AGGRAVATED MURDER WAS NOT DISMISSED UNTIL OCTOBER 16, 1995.

FN1. The complaint defendant references charged defendant with murder, not aggravated murder.

*State v. Chavis*, *supra; Exhibit 16 to Return of Writ.*  On December 26, 1996, the appellate court

8

affirmed the trial court's judgment.  *Id.; Exhibit 19 to Return of Writ.*  Still represented by counsel, petitioner filed a timely appeal in which he again raised all of the same issues that previously were raised.  Exhibit 21 to Return of Writ.  On May 14, 1997, the Ohio Supreme Court denied leave to appeal and dismissed the appeal as not involving any substantial constitutional question.  Exhibit 23 to Return of Writ.  On August 11, 1997, petitioner filed an application to reopen the appeal pursuant to Ohio Appellate Rule 26(B); however, on November 6, 1997, the appellate court denied the application as untimely.  *Exhibits 24 and 25 to Return of Writ*.  Petitioner apparently never filed an appeal of the appellate court's dismissal.

On March 3, 1997, petitioner filed a post conviction petition in the state trial court.  *Exhibits 26 and 27 to Return of Writ*.  On August 15, 2005, the trial court denied the petition.  Exhibit 31 to Return of Writ.  Represented by counsel, petitioner filed a timely appeal.  He asserted the following claim:

> THE TRIAL COURT ERRED WHEN IT DISMISSED DEFENDANT' [SIC] PETITION FOR POST-CONVICTION RELIEF WITHOUT A HEARING AFTER THE DEFENDANT HAD MADE A PRIMA FACIE CASE OF INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL.

*State v. Chavis-Tucker*, 2006 WL 1681450 (June 20, 2006).  On June 20, 2006, the appellate court denied the petition as untimely.  *Id.*  Petitioner filed a timely appeal.  *Exhibit 38 to Return of Writ*. On November 1, 2006, the Ohio Supreme Court denied leave to appeal and dismissed the appeal as not involving any substantial constitutional question.  *Exhibit 40 to Return of Writ*.  Meanwhile, on August 26, 1998, again represented by counsel, petitioner filed a motion for new trial based upon newly discovered evidence in the state trial court.  *Exhibit 42 to Return of Writ*.  After an evidentiary hearing, on September 19, 2000, the trial court denied petitioner's motion.  Exhibit 47 to Return of

9

Writ.  Petitioner filed a timely appeal; however, on January 10, 2001, the appeal was *sua sponte* dismissed for failure to file an appellate brief.  *Exhibits 48 and 49 to Return of Writ.*

On December 20, 2006, petitioner filed the instant *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. §2254.  He alleges that he is in the custody of the respondent in violation of the Constitution of the United States based upon the following grounds:

> 1.  The petitioner was denied the effective assistance of counsel.
>
> 2.  Prosecutorial misconduct, due to improper comments by the prosecutor in closing argument.
>
> 3.  The trial court erred when it dismissed petitioner's motion for post conviction relief without an evidentiary hearing.
>
> 4.  The court of appeals violated petitioner's due process right to full and fair appellate review when it dismissed petitioner's post conviction petition as untimely.
>
> 5.  The court of appeals erred and violated petitioner's due process rights when it dismissed petitioner's case on procedural grounds after he showed a colorable claim of actual innocence.

It is the position of the respondent that this action must be dismissed as time-barred under 28 U.S.C. §2244(d); alternatively, respondent contends that petitioner's claims are without merit, procedurally defaulted, or not cognizable in federal habeas corpus review.

## STATUTE OF LIMITATIONS

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), which became effective on April 24, 1996, imposes a one-year statute of limitations on the filing of habeas corpus petitions.  28 U.S.C. §2244(d) provides:

> (d)(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of--
>
> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
>
> (2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

Petitioner's conviction became final on August 12, 1997, ninety days after the Ohio Supreme Court's May 14, 1997, dismissal of his direct appeal, when the time period expired to file a petition for a writ of *certiorari* with the United States Supreme Court. *Bronaugh v. Ohio*, 235 F.3d 280, 283 (6th Cir. 2001). The statute of limitations expired one year later, on August 12, 1998. Petitioner did not execute the instant habeas corpus petition until December 12, 2006, more than eight (8) years later. Neither petitioner's August 11, 1997, Rule 26(B) application, nor his March 3, 1997, post conviction petition tolled the running of the statute of limitations, since both such actions were denied as untimely and thus not "properly filed" within the meaning of 28 U.S.C. §2244(d)(2). *Pace v. DiGuglielmo,* 544 U.S. 408, 417 (2005); *Israfil v. Russell*, 276 F.3d 768, 771-72 (6th Cir.2001);

11

*Tomilson v. Hudson*, 2007 WL 1831135 (N.D. Ohio June 25, 2007); *Gorman v. Brunsman*, 2006 WL 1645066 (S.D. Ohio June 7, 2006), citing *Vroman v. Brigano,* 346 F.3d 598, 603 (6th Cir.2003); *Malroit v. Bagley*, 2006 WL 3407870 (N.D. Ohio November 22, 2006).

> .        [A]n application is "*properly* filed" when its delivery and acceptance are in compliance with the applicable laws and rules governing filings. These usually prescribe, for example, the form of the document, the time limits upon its delivery, the court and office in which it must be lodged, and the requisite filing fee. *See*, *e.g., Habteselassie v. Novak,* 209 F.3d 1208, 1210-1211 (C.A.10 2000); 199 F.3d, at 121 (case below); *Villegas v. Johnson,* 184 F.3d 467, 469-470 (C.A.5 1999); *Lovasz v. Vaughn,* 134 F.3d 146, 148 (C.A.3 1998).

*Artuz v. Bennett,* 531 U.S. 4, 8 (2000)(footnote omitted).  Further, petitioner has failed to allege extraordinary circumstances that would justify equitable tolling of the statute of limitations for the time period at issue.  *See Jurado v. Burt*, 337 F.3d 638, 643 (6th Cir. 2003).

Petitioner's August 28, 1998, motion for a new trial likewise did not toll the running of the statute of limitations in this case, since such action was filed after the statute of limitations had already expired.  "The tolling provision does not ... 'revive' the limitations period ( *i.e.,* restart the clock at zero); it can only serve to pause a clock that has not yet fully run." *Vroman v.. Brigano,* 346 F.3d 598, 601 (6 Cir.2003), citing *Rashid v. Khulmann,* 991 F.Supp. 254, 259 (S.D.N.Y.1998); *Winkfield v. Bagley,* 66 Fed.Appx. 578, unpublished, 2003 WL 21259699 (6th Cir. May 28, 2003)(same).

Petitioner contends that the state appellate court improperly denied his March 3, 1999, post conviction petition as untimely because that petition was in fact timely filed.  Post conviction petitions must be filed no later than 180 days after the date on which the trial transcript is filed in the court of appeals.  O.R.C. §2953.21(A)(2)(1996).  Supplemental transcripts, relating to pretrial

proceedings, were apparently filed in the court of appeals subsequent to September 4, 1996.  *See Exhibit A* attached to petitioner's *Traverse*, Doc. No. 14.  Thus, petitioner contends that his March 3, 1997, post conviction petition was filed within 180 days thereafter and was therefore timely.  In characterizing petitioner's post conviction petition as untimely, the state court of appeals noted that petitioner's trial transcript was filed in the court of appeals on June 14, 1996, and held that the filing of supplemental transcripts thereafter did not serve to extend the time by which a post conviction petition could properly be filed.  *State v. Chavis,* 2006 WL 1681450, *2.

The state appellate court's decision follows the express language of Ohio's statute, which provides that the time period for filing a post conviction petition runs from the date that the trial transcript is filed in the state court of appeals.[1]  The statute does not refer to the filing of supplemental transcripts.  In any event, this Court must defer to the state court's ruling on the timeliness of the post conviction petition.

> Principles of comity require federal courts to defer to a state's judgment on issues of state law and, more particularly, on issues of state procedural law. *Engle v. Isaac,* 456 U.S. 107, 128-29, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982); *Murray v. Carrier,* 477 U.S. 478, 491, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). Because state courts are the final authority on state law, *see Hutchison v. Marshall,* 744 F.2d 44, 46 (6th Cir.1984), federal courts must accept a state court's interpretation of its statutes and its rules of practice. *Duffel v. Dutton,* 785 F.2d 131, 133 (6th Cir.1986). Therefore, it follows that the

---

[1]O.R.C. §2953.21(A)(2) provides:

> A petition under division (A)(1) of this section shall be filed no later than one hundred eighty days after the date on which the trial transcript is filed in the court of appeals in the direct appeal of the judgment of conviction or adjudication or the date on which the trial transcript is filed in the supreme court if the direct appeal involves a sentence of death. If no appeal is taken, the petition shall be filed no later than one hundred eighty days after the expiration of the time for filing the appeal.

13

> district court properly deferred to the state court's finding as to
> whether [petitioner's] third post-conviction motion had been
> submitted according to Ohio's timeliness requirements.

*Israfil v. Russell, supra*, 276 F.3d at 771-72.  *But see Greer v. Mitchell*, 264 F.3d 663, 675 (6th Cir.

2001)("Generally, a federal habeas court... should not second guess a state court's decision

concerning matters of state law," citing *Gall v. Parker*, 231 F.3d 265, 303 (6th Cir.2000),  but stating

in dictum that "when the record reveals that the state court's reliance upon its own rule of procedural

default is misplaced, we are reluctant to conclude categorically that federal habeas review of the

purportedly defaulted claim is precluded.") However, this Court is not persuaded that the record in

this case demonstrates that the state court's decision was in any respect erroneous.

Petitioner also asserts that he is actually innocent and that "trustworthy eyewitnesses... would

have testified that he was not the shooter."  *Memorandum in Support of Petition*, at 25.  In support

of this allegation, petitioner has attached the same affidavits he attached to his state petition for post

conviction relief.  Some of these affidavits (*i.e.*, the affidavits of Celestine Pankey, James Smith and

Karen Campbell) were submitted to the state courts in support of petitioner's motion for a new trial.

To summarize, these witness affidavits indicate as follows: On the night in question,

Anthony Eskridge saw security guard Banks pull a gun from under his jacket and fire a warning shot

into the air.

> Tucker then got back in the car and fired back at Mr. Banks, who
> opened fire on the car.  When the car finally pulled off, Mr. Banks
> was still shooting.  Then... I saw the other security guard laying on
> the ground shot in the face.

*Affidavit of Anthony Eskridge, June 17, 2001, Exhibits to Objections*, Doc. No. 5.  Eskridge spoke

with police but never heard back from them.  *Id.*    Morinda Booth also saw "one of the security

14

guards" start shooting at a man in a blue car parked by the front entrance of the club (*i.e.*, petitioner).

*Affidavit of Morinda Booth, June 25, 2001, Exhibits to Objections,* Doc. No. 5.

> The man jumped back in the car, and started shooting back at the security guard in the parking lot. As the security guard proceeded to shoot in the direction of the guy in the car from out in the middle of the parking lot, I saw another security guard who was coming out of the front entrance way of the club, directly behind the guy in the car, fall on the ground.

*Id.* Booth spoke to police, but never heard back from the police. *Id.* Steve Alexander, who testified

as a prosecution witness, stated in his affidavit:

> On the night of April 11, 1992, I was working as a security guard at Club Alexander's. One of my duties was to put stickers on vehicles in the parking lot that were inappropriately parked.
>
> I placed a sticker on a blue Dynasty that was parked by the dumpster at the south end of the parking lot....

*Affidavit of Steve Alexander, October 18, 2000, Exhibits to Objections*, Doc. No. 5. Alexander saw

no bullet holes or flat tires on the car. *Id.* Terri Tucker did not witness the incident in question, but

during trial heard Christian Wade and Tonee Andrews tell defense counsel that they were willing

to testify as defense witnesses that it was not petitioner who killed Ernest Penn. *Affidavit of Terri

Tucker, February 24, 1997, Exhibits to Objections*, Doc. No. 5. Charmelle Macklin also heard Wade

and Andrews offer to testify for the defense at trial. *Affidavit of Charmelle Macklin, February 24,

1997, Exhibits to Objections*, Doc. No. 5. Christin Dion Wade was standing in the parking lot of

Club Alexander's on the night in question and saw petitioner and a woman walking with security

guard Doyle Banks. Petitioner and the woman entered a blue car, drove off, and pulled to the front

of the entrance of the club. Banks yelled, "hey," and began shooting. Petitioner got back into his

car and started shooting back at Banks. Banks hopped onto the hood of a car and continued to shoot

at petitioner. Wade watched Ernest Penn fall directly behind petitioner. He informed defense counsel of what he had seen and expressed his willingness to testify for the defense. *Affidavit of Christin Dion Wade, February 24, 1997, Exhibits to Objections,* Doc. No. 5. Tonee Andrew heard gunshots after a blue car pulled up to the front entrance and a man exited. She saw another man shooting in the parking lot.

> The man in the blue car got back in his car and started shooting out of the driver side window towards the man who was standing in the parking lot shooting at him.

> The man... shooting at the blue car, in the direction of the entranceway of the club, got up on the hood of a car parked in the lot and proceeded to shoot at the blue car from up on the hood....

> After a brief exchange, the man in the blue car stopped shooting and was pulling off, but the man [who] was shooting on top of the hood of the car got down and started to chase and shoot at the car as it was driving off.

*Affidavit of Tonee Andrews, February 24, 1997, Exhibits to Objections*, Doc. No. 5. Phyllis Leindsey was also in the parking lot of the club that night. She saw a car pull up to the entrance

> and a man started to get out of the car when a man over in the parking lot started shooting at the man in the car and that's when the man in the car started shooting out the driver's window back towards the man who was shooting at him from the parking lot.

> ... Then the man who was shooting from within the parking lot stood up on top of the hood of a car and was shooting at the man in the car from up there. That's when I saw a man who was standing by the entrance fall down, the car pulled off real fast and the man who was in the parking lot was shooting while chasing after the car as it drove out of the parking lot. This is when I pulled off, got out of there and went straight home.

*Affidavit of Phyllis Leindsey, February 25, 1997, Exhibits to Objections,* Doc. No. 5. Celestine

16

Pankey, who provided a taped statement to police that contradicts her affidavit and who was held in contempt of court for failing to appear as a prosecution witness at trial, *see Exhibits 43 and 44 to Return of Writ*,[2] states in her affidavit that she was with petitioner on the night in question and in his car when Doyle Banks started shooting at them.  Petitioner "stuck his arm out of the driver side window and started shooting back toward Doyle Banks who was in the parking lot shooting at us." *Affidavit of Celestine Pankey, August 26, 1998, Exhibits to Objections,* Doc. No. 5.   A tire on the car was flattened (purportedly as a result of the shoot out) and she saw a bullet hole in the car that had not been there before.  *Id.*  She lied when she told police that petitioner shot into a crowd of people and towards the entrance of the club where Penn was killed because Banks and Alexander had threatened her.  She also states that she told the prosecutor that she had lied in her taped statement to police.  *Id.*  Karen Campbell likewise states that she saw Doyle Banks shooting toward a man in a blue car.  She then saw the man in the car shoot back and drive off  "real fast, with Doyle still shooting at him." *Id.*  It was Doyle who was shooting in the direction of the club where she and Penn were standing.   After Penn had been shot and was lying on the ground,  bleeding, Doyle approached them:

_____

[2]  The state appellate court noted:

One important witness to this case, Pankey, failed to appear for the trial despite being ordered to do so by the trial court; a warrant was issued for her arrest. Given the testimony admitted at trial, Pankey clearly would have been a key witness in this case: Pankey left with defendant as he was being barred from Club Alexander's, and she was seen in the Dodge Dynasty, leaning back, when the shot which killed Penn was fired from it.

*State v. Chavis, supra*, 1996 WL 737583.

> I said, "Doyle, I think you shot Ernest." And he said, "I know I was
> trying to hit that dude James Tucker in that car but he drove off too
> damned fast, but don't worry about it, I'm going to take care of it,"
> and then he told me that ... I had better not say anything about it to
> nobody....
>
> One of the bullets from Doyle's gun hit the wall of the club right
> behind where I was....

*Affidavit of Karen Campbell, August 25, 1998, Exhibits to Objections*, Doc. No. 5. Finally, James

Smith did not see the shooting, but was inside the club and heard Doyle Banks say that he had fired

a warning shot into the air and then had fired at petitioner's car. According to Smith, Banks said

he knew he had hit the car, but wasn't sure if he had hit anyone in the car. He needed to get rid of

the gun and left the club with Steve Alexander. *Affidavit of James Smith, July 29, 1999, Exhibits*

*to Objections*, Doc. No. 5.

Actual innocence may justify equitable tolling of the statute of limitations. *Souter v. Jones*,

395 F.3d 577, 602 (6th Cir. 2005).

> The United States Supreme Court has held that if a habeas petitioner
> "presents evidence of innocence so strong that a court cannot have
> confidence in the outcome of the trial unless the court is also satisfied
> that the trial was free of nonharmless constitutional error, the
> petitioner should be allowed to pass through the gateway and argue
> the merits of his underlying claims." *Schlup,* 513 U.S. at 316, 115
> S.Ct. 851. Thus, the threshold inquiry is whether "new facts raise[ ]
> sufficient doubt about [the petitioner's] guilt to undermine confidence
> in the result of the trial." *Id.* at 317, 115 S.Ct. 851. To establish actual
> innocence, "a petitioner must show that it is more likely than not that
> no reasonable juror would have found petitioner guilty beyond a
> reasonable doubt." *Id.* at 327, 115 S.Ct. 851. The Court has noted that
> "actual innocence means factual innocence, not mere legal
> insufficiency." *Bousley v. United States,* 523 U.S. 614, 623, 118 S.Ct.
> 1604, 140 L.Ed.2d 828 (1998). "To be credible, such a claim requires
> petitioner to support his allegations of constitutional error with new
> reliable evidence-whether it be exculpatory scientific evidence,

> trustworthy eyewitness accounts, or critical physical evidence-that
> was not presented at trial." *Schlup,* 513 U.S. at 324, 115 S.Ct. 851.
> The Court counseled however, that the actual innocence exception
> should "remain rare" and "only be applied in the 'extraordinary case.'
> " *Id.* at 321, 115 S.Ct. 851.

*Id.*, at 589-90 (footnote omitted).  Petitioner has failed to meet this standard here.

The statute of limitations in this case expired on August 12, 1998.  The affidavits of Christin Dion Wade, Tonee Andrews, Phyllis Leindsey, Terri Tucker, and Charmell Macklin were obtained in 1997, *i.e.*, prior to the expiration of the statute of limitations.  The remaining affidavits submitted in support of petitioner's claim of actual innocence were obtained between 1998 and 2001. However, petitioner waited years later -- until December 2006 -- to file the instant habeas corpus petition, but fails to explain why he did not file his petition based upon such "new" evidence within the one-year statute of limitations, or at least shortly after its expiration, when he obtained the affidavits presented in this petition.  *See Maag v. Konteh*, unpublished, 2006 WL 2457820 (N.D. Ohio August 23, 2006)(police report that existed and was available to petitioner at the time of trial but was not admitted into evidence did not constitute new evidence for the actual innocence gateway required by the Supreme Court in *Schlup*.)  Additionally,

> [t]here has been some debate among the circuits regarding the
> meaning of the phrase "new reliable evidence" as it was used in
> *Schlup.* Whereas some circuits have found that evidence is "new" for
> purposes of conducting a *Schlup* analysis if it was not *presented* at
> trial, *see, e.g.*,*Gomez v. Jaimet,* 350 F.3d 673 (7th Cir. 2003); *Griffin
> v. Johnson,* 350 F.3d 956, 962-63 (9th Cir. 2003), others have held
> that to be "new," the evidence must not have been *available* at the
> time of trial. *See, e.g., Armine v. Bowersox,* 238 F.3d 1023, 1028 (8th
> Cir. 2001). In *Hubbard v. Pinchak,* 378 F.3d 333, 341 (3d Cir. 2004),
> the Third Circuit adopted the latter interpretation, suggesting that
> only newly-available evidence would be considered "new" for
> purposes of *Schlup.*

19

*Melton v. Shannon*, unpublished, 2004 WL 2755549 (E.D. Pennsylvania November 30, 2004).

In any event, and even assuming that the affidavits submitted by petitioner constitute "new" evidence within the meaning of *Schlup, supra*, 513 U.S. at 324, none of these affidavits constitute reliable eyewitness accounts that cast sufficient doubt on petitioner's guilt as to justify equitable tolling of the statute of limitations. *See Souter v. Jones, supra*, 395 F.3d at 590. Celestine Pankey has a child by petitioner's cousin. *Transcript, Motion for a New Trial*, at 31, *Exhibit 54 to Return of Writ*. She also has a prior criminal record, including convictions for receiving stolen property and robbery, and a history of substance addiction. *Id*., at 30. Her affidavit contradicts her prior videotaped statement to police; she stated at the post conviction hearing that she repeatedly lied in her statement to police because she was "scared and confused" and had been threatened by Alexander and Banks. *Id.*, at 21-22, 25, 38. She served ten days in jail for contempt after failing to appear to testify at petitioner's trial. *Id.,* at 29-30; *see also Exhibit 43 to Return of Writ*. Pankey's recantation of her prior videotaped statement to police may be viewed with skepticism, particularly in view of her refusal to testify at trial. *See Carter v. Mitchell*, 443 F.3d 517, 538 (6th Cir. 2006), citing *Dobbert v. Wainwright,* 468 U.S. 1231, 1233-34 (1984); *Byrd v. Collins*, 209 F.3d 486, 508 n. 16 (6th Cir.2000)(quoting *Spence v. Johnson,* 80 F.3d 989, 997 (5th Cir.1996)); *Artiaga v. Money*, unpublished, 2006 WL 1966612 (N.D. Ohio July 11, 2006), citing *United States v. Chambers,* 944 F.2d 1253, 1264 (6th Cir.1991); *Allen v. Woodford,* 395 F.3d 979, 994 (9th Cir.), *cert. denied sub nom Allen v. Brown,* 126 S.Ct. 134 (2005)(quoting 58 Am.Jur., *New Trial* § 345).

Similarly, the affidavit of James Smith lacks credibility: he made no statement until after he had been convicted of federal criminal charges and, in any event, did not witness the shooting.

Karen Campbell likewise did not come forward with her statement until approximately two

years after petitioner had been convicted for the murder of Ernest Penn.  She never called police or attorneys, and did not come forward sooner because she was "afraid," even thought she knew Banks and Penn through her job as a dancer at the club.  *See Transcript, Motion for a New Trial*, at 69-74, *Exhibit 54 to Return of Writ*.

The affidavit of Steve Alexander does not constitute new evidence of innocence, because Alexander testified at trial regarding the same statements he makes in his affidavit.  Alexander testified at trial that he was employed as a security guard for Club Alexander's on the night Penn was killed.  Alexander applied an orange sticker on the front driver side windshield of the car later identified as that driven by petitioner, because the car had been parked improperly.  *Transcript*, at 119, 135, 139, 142-44, *Exhibit 53 to Return of Writ*.  On cross examination, Alexander testified that he did not notice anything unusual about the car when he applied the sticker to the driver side windshield.  *Id.*, at 181, 184.  The car was found two to three days later in the parking lot of a hotel on Shrock Road.  *Id.*, at 193.  The car had a projectile hole and a temporary tire; a flat tire was in the trunk.  *Id.*, at 197-199.

In order to establish a gateway actual innocence claim so as to justify equitable tolling of the statute of limitations,

> the petitioner "must show that it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt." *Schlup,* 513 U.S. at 327, 115 S.Ct. 851; *see id.* at 329, 115 S.Ct. 851 ("[T]he standard requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do. Thus, a petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt."); *see also Souter,* 395 F.3d at 602. "[T]o be credible a gateway claim requires new reliable evidence-whether it be exculpatory scientific evidence,

trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial." *House v. Bell,* --- U.S. ----, 126 S.Ct. 2064, 2077, 165 L.Ed.2d 1 (2006) (internal quotation marks omitted).

*McCray v. Vasbinder*, – F.3d –, 2007 WL 2416426 (6th Cir. August 28, 2007).  The District Court

must consider "all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial."

*Id*., citing *House v. Bell, supra*; *see also Souter v. Jones, supra*, 395 F.3d at 396.

The affidavits submitted by petitioner in support of his claim of actual innocence differ from each other in material respects – *e.g.*, whether or not Banks jumped onto a car while shooting at petitioner, and whether he gave chase as petitioner drove off.   Further, the affidavits contradict much of the testimony at trial.  For example, Banks testified that he returned to the bar after escorting petitioner out. *Transcript,* at 91, *Exhibit 53 to Return of Writ*.  William Fowlkes, another security guard working on the night Penn was killed, corroborated that Banks returned to the bar after escorting petitioner to his car. *Id.*, at 483.  Steve Alexander testified that only three shots were fired. *Id*., at 139.  Darrell Strickland heard two shots. *See State v. Chavis, supra*, 1996 WL 737583.[3] Sergeant Steve Kelley, the primary homicide investigator on the case, received no information from witnesses that there was more than one shooter. *Id.*, at 353.  Additionally, evidence linked the bullet that killed Penn to the car that petitioner was driving, and witnesses testified that petitioner was angry and intoxicated  and thus had a motive to begin shooting towards Strickland as Penn was

---

[3] Unfortunately, Strickland's trial testimony was apparently omitted from the trial transcript made a part of the record before this Court; however, the state appellate court summarized Strickland's testimony, *see State v. Chavis, supra*, and those findings are presumed to be correct.  28 U.S.C. §2254(e).

escorting him out of the bar.  *See State v. Chavis, supra*, 1996 WL 737583.  There is no evidence to indicate that the damage to the car petitioner was driving occurred as a result of a shoot out on the night Penn was killed – or from a gun fired by Banks.  Finally, Penn identified petitioner when he told Strickland to "get down" and pushed Strickland down out of harm's way just before Penn was killed.  *Id.*

Thus, while the proffered testimony from defense witnesses would require additional credibility determinations to be made by the jury, when viewed against the other incriminating evidence presented against petitioner at trial, the affidavits simply fail to meet the high standard required to establish a gateway actual innocence claim – *i.e*., that considering such evidence it is "more likely than not that no reasonable juror would have found [petitioner] guilty beyond a reasonable doubt," *Souter v. Jones, supra*, 395 F.3d at 396, so as to justify equitable tolling of the statute of limitations in this case.

Further, and in any event, the record reveals that all of petitioner's claims are plainly without merit.

## CLAIM ONE

In claim one, petitioner asserts that he was denied the effective assistance of counsel:

> [C]ounsel failed to call to the stand a detective who interviewed the only witness who claimed to have heard the victim say, "there he is," before the victim was shot when the detective's investigative summary indicated that the witness never claimed to have heard such a statement (T. 437), defense counsel failed to ask important questions about identification to key state witness who claimed to recognize petitioner's female companion in the car immediately prior to the shooting (T. 154 to 176), defense counsel failed to object to the admission of impermissible hearsay testimony that a potential suspect was not present at the time of the shooting (T. 463, 497), defense

23

counsel failed to object to inadmissible hearsay concerning whether
any witnesses saw two different people firing guns at [C]lub
[A]lexanders (T. 371), defense counsel failed to object to incomplete
jury instructions concerning identification when key issue in the case
was identification (T. 664), and defense counsel failed to interview
most of the State's witnesses until they were on the witness stand (T.
98, 153, 336, 460, 461, 491).

*Memorandum in Support of Petition*, at 2.   The state appellate court rejected petitioner's claim as

follows:

> Defendant's third assignment of error contends he was deprived of his
> constitutional right to effective assistance of trial counsel. In order to
> prevail on an ineffective assistance claim, a defendant must
> demonstrate that trial counsel's performance was deficient and that
> defendant was prejudiced by that performance. *Strickland v.
> Washington* (1984), 466 U.S. 668, 687. Essentially, defendant's
> burden involves showing that counsel's performance fell below an
> objective standard of reasonableness, *Id.* at 688, and that but for that
> unreasonable performance, the outcome of the proceedings would
> have been different. *Id.* at 694. A failure to demonstrate either a
> performance error on trial counsel's part or the requisite level of
> prejudice is fatal to defendant's claim of ineffective assistance of
> counsel. *Id.* at 687.

> Initially, defendant alleges his trial counsel erred in failing to call a
> certain police detective to the stand, or at least move for a
> continuance in order to secure his presence. During cross-
> examination of Strickland, defense counsel made a Crim.R.
> 16(B)(1)(g) request for any statement Strickland may have made to
> police. The prosecution produced a copy of a police summary, which
> indicated Strickland told Detective Cassidy that just before he was
> shot, Penn stated "[t]hey're shooting" rather than "[t]here he is, get
> down." The trial court ruled the police summary was not a "witness'
> statement" for purposes of Crim.R. 16(B)(1)(g), and the defense thus
> could not cross-examine Strickland on that statement. Defendant now
> claims his trial counsel was constitutionally ineffective for not calling
> Detective Cassidy to the stand or moving for a continuance to secure
> his presence.

> Defense counsel's decision not to request a continuance to secure
> Detective Cassidy's presence may well have been motivated by

24

strategic concerns. One important witness to this case, Pankey, failed to appear for the trial despite being ordered to do so by the trial court; a warrant was issued for her arrest. Given the testimony admitted at trial, Pankey clearly would have been a key witness in this case: Pankey left with defendant as he was being barred from Club Alexander's, and she was seen in the Dodge Dynasty, leaning back, when the shot which killed Penn was fired from it. Indeed, during their deliberations, the jury asked if they could know why Pankey had not testified, to which the trial court answered "no." (Tr. 722-723.) Thus, defense counsel's decision not to move for a continuance to secure Detective Cassidy's testimony may have been motivated by a desire to complete the trial before Pankey could be located. Moreover, the record does not disclose what Detective Cassidy would have said during his testimony; thus, we cannot determine from this record whether defendant suffered any prejudice as a result of the alleged failure on the part of defense counsel.

Defendant next argues that defense counsel were ineffective in not objecting to alleged hearsay testimony from William Fowlkes, head of security at Club Alexander's, concerning the whereabouts of Joe Murchison, the parking lot security guard at Club Alexander's. At trial, defense counsel questioned Fowlkes about the hour Joe Murchison arrived at the bar; Fowlkes insisted that Murchison was not there before the shooting. Defense counsel then inquired if Fowlkes would change his testimony if he was told the shooting occurred on or about 2:00 a.m. Fowlkes responded, "[n]o, because I can't change it because Ted [Alexander] jumped on him [Murchison]. He said: Murchison, maybe if you was here Ernest [Penn] wouldn't be dead. I remember that real good. We was out front. He jumped on him about that." Defendant insists that Fowlkes' testimony regarding what Alexander told Murchison constituted inadmissible hearsay and was prejudicial to his case because it tended to eliminate defendant's theory that Murchison, rather than defendant, shot Penn.

Hearsay is a statement admitted for purposes of proving the truth of the matter asserted. Evid.R. 801(C). In this case, the testimony arguably was not admitted to prove the truth of the matter asserted: that Penn might still be alive if Murchison had been out in the parking lot. Rather, it was admitted to show why Fowlkes would not change his testimony about the hour Murchison arrived at Club Alexander's on the night in question, even if he was told the shooting occurred around 2:00 a.m. Moreover, all of Club Alexander's employees who testified on the issue stated Murchison did not arrive until after the shooting; thus, even if the statement was hearsay to

25

which defense counsel should have objected, defendant cannot demonstrate the reasonable probability of a different result at trial had defense counsel objected to Fowlkes' testimony.

Defendant also contends his defense counsel erred in not objecting to alleged hearsay testimony from Vanessa Simpkins, another security guard at Club Alexander's. Further alleging Simpkins' answer was non-responsive to the question, defendant refers to the following exchange between defense counsel and Simpkins:

"Q. You saw Mr. Murchison that evening then?

"A. Yes, after the shooting had happened.

"Q. Okay. And that was right at about the time of the shooting; is that correct?

"A. Yes, because he asked what had happened." (Tr. 463.)

"Because a true question or inquiry is by its nature incapable of being proved either true or false and cannot be offered "to prove the truth of the matter asserted," it does not constitute "hearsay" as defined by Evid.R. 801." *State v. Carter* (1995), 72 Ohio St.3d 545, paragraph two of the syllabus. Thus, Simpkins' testimony relating Murchison's true question to her did not constitute hearsay. Further, while the answer did volunteer information that was not sought in the question, defense counsel's failure to object to or move to strike the testimony did not affect the outcome of the proceedings.

Defendant also faults his trial counsel for not making a second Crim.R. 16(B)(1)(g) request during the cross-examination of Doyle Banks, a security guard at Club Alexander's. After Banks finished testifying, defense counsel requested any Crim.R. 16(B)(1)(g) material the state had concerning him. The prosecutor insisted he had none. During cross-examination, Banks testified he had talked to two plainclothes officers on the night of the shooting and may have talked to them on one other occasion. He also testified the officers took notes while they were interviewing him. Defendant claims his attorneys should have made a second Crim.R. 16(B)(1)(g) motion once they learned that the police took notes during their interview with Banks.

"Notes made by a police officer during an interview with a witness to a crime are not subject to an in camera inspection within the intent

26

and meaning of Crim.R. 16(B)(1)(g)." *State v. Washington* (1978), 56 Ohio App.2d 129, paragraph two of the syllabus. Moreover, since the notes were never made part of the record in this case, we cannot determine from this record whether defendant suffered any prejudice as a result of the alleged error in defense counsel's performance.

Defendant next asserts his trial counsel erred when they failed to adequately cross-examine Steve Alexander regarding his testimony that he saw Pankey in the car at the time shots were being fired from it. Defendant argues his defense counsel should have asked Alexander if he had ever seen Pankey before, and how long he had an opportunity to see her that night. Once again, however, this record does not reflect what Alexander would have said had he been asked those questions. Thus, this record does not disclose whether defendant suffered any prejudice from trial counsel's performance.

Defendant further claims his defense counsel erred in failing to object to alleged hearsay testimony from Sergeant Steve Kelley who, in response to questioning from the prosecution, testified he did not receive any information two different people were firing guns at Club Alexander's on the night of the incident. Defendant claims that Sergeant Kelley's response constituted hearsay. Hearsay, however is a "statement, other than one made by the declarant while testifying at the trial or hearing * * *." Evid.R. 801(C). A "statement" is defined as "(1) an oral or written assertion, or (2) nonverbal conduct of a person, if it is intended by him as an assertion." Evid.R. 801(A). Here, no out-of-court statement was admitted as a result of Sergeant Kelley's testimony; hence, it did not constitute hearsay.

Defendant also faults his trial counsel for not asking any of Club Alexander's employees whether their testimony was biased as result of the civil liability that could attach to Club Alexander's if Penn was shot by one of the nightclub's security guards rather than by defendant. The transcript, however, reveals defense counsel did raise the issue during the cross-examination of Doyle Banks. Similarly, defendant contends his trial counsel erred in not asking any of Club Alexander's employees about any friendship they felt toward fellow employees. The decision to ask or not to ask such questions fits well within the broad leeway that defendant's trial counsel had in making strategic decisions regarding the presentation of defendant's case. See *Strickland, supra.* Further, this record does not disclose whether defendant suffered any prejudice as a result of defense counsel's alleged failure.

Defendant also complains his trial counsel was ineffective in not objecting to an omission in the jury instructions regarding the testimony of identifying witnesses. The trial court provided the jury with the instruction on eyewitness testimony set forth in 4 Ohio Jury Instructions (1996) 41, Section 405.20(5), except for the sentence which instructs the jury to consider, "[t]he accuracy of witness' prior description (or identification, if any)." Defendant contends the instruction was important in connection with Penn's identification of defendant immediately prior to the shooting, presented through Strickland's testimony, and with Alexander's identification of Pankey. However, neither Penn nor Alexander provided any prior description or identification of the person identified. The instruction did not apply, and defense counsel committed no error by failing to object to its absence.

Finally, defendant contends his defense counsel were ineffective in not interviewing many of the state's witnesses prior to their testimony at trial. Defendant premises his argument on defense counsel's decision to deliberately make known to the jurors through questions posed to a witness whether defense counsel had spoken with the witness prior to trial. Defense counsel presumably had some tactical purpose in mind when they let that information reach the jury, perhaps to suggest to the jurors that they, unlike the state, were presenting unrehearsed testimony. Moreover, defendant does not attempt to explain how he could have benefitted from greater preparation, nor is it possible for him to demonstrate such prejudice from this record.

Accordingly, defendant's third assignment of error is overruled.

*State v. Chavis*, 1996 WL 737583 (Ohio App. 10 Dist. Dec. 26, 1996), *Exhibit 19 to Return of Writ.*

The findings of the state appellate court are presumed to be correct:

In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. §2254(e)(1).  Further, a federal habeas court cannot grant relief unless the state court

contravenes or unreasonably applies federal law or issues a decision based upon an unreasonable

determination of the facts:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. §2254(d).

> A state court's determination is contrary to federal law when the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or on indistinguishable facts. *Williams v. Taylor,* 529 U.S. 362, 412-13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court's decision is an unreasonable application of federal law when the state court correctly identified the applicable legal principle from Supreme Court precedent, but applied that principle to the facts before it in an unreasonable manner. *Id.* at 413, 120 S.Ct. 1495.

*Maldonado v. Wilson,* 416 F.3d 470, 475 (6th Cir.2005). Petitioner has failed to meet this standard here.  *See Williams v. Taylor, supra.*

The right to counsel guaranteed by the Sixth Amendment is the right to effective assistance of counsel.  *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970).  The standard for reviewing a claim of ineffective assistance of counsel is twofold:

> First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also Blackburn v. Foltz*, 828 F.2d 1177 (6th Cir. 1987). "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689.

To establish prejudice, it must be shown that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different. *Id.,* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*., at 697. Because petitioner must satisfy both prongs of the *Strickland* test to demonstrate ineffective assistance of counsel, if the Court determines that petitioner has failed to satisfy one prong, it need not consider the other. *Strickland,* 466 U.S. at 697.

For the reasons detailed by the state appellate court, this Court agrees that petitioner has failed to establish the ineffective assistance of counsel under *Strickland.*

Claim one is without merit.

## CLAIM TWO

In claim two, petitioner asserts that he was denied a fair trial because the prosecutor made improper statements during closing argument that mischaracterized the evidence. Petitioner complains that the prosecutor improperly argued that the bullet hole found in the car that petitioner was alleged to have been driving when he shot and killed Ernest Penn was fired from above, and that the evidence did not indicate that the bullet hole had been made at the time of the incident in question. *See Exhibit 16 to Return of Writ, petitioner's Appellate Brief*, at 34-35. The state appellate court rejected this claim as follows:

Defendant's fourth assignment of error asserts defendant was deprived of a fair trial by ... instances of prosecutorial misconduct....

[Defendant] claims that the prosecutor misrepresented the evidence presented at trial during closing argument. "The test regarding prosecutorial misconduct in closing arguments is whether the remarks were improper and, if so, whether they prejudicially affected the substantial rights of the defendant." *State v. Smith* (1984), 14 Ohio St.3d 13, 14. Reversible error cannot be predicated upon a prosecutor's conduct unless such conduct deprived the defendant of a fair trial. *State v. Apanovitch* (1987), 33 Ohio St.3d 19, 24. Moreover, "[p]rosecutors are entitled to latitude as to what the evidence has shown and what inferences can be drawn therefrom." *State v. Richey* (1992), 64 Ohio St.3d 353, 362. The trial court has discretion to determine the propriety of the arguments. *State v. Loza* (1994), 71 Ohio St.3d 61, 78.

During his closing argument, the prosecutor referred to state's Exhibit 5-17, suggesting the bullet fired into the Dodge Dynasty was fired from above and traveled "generally up and down, but slightly from the driver's side to the passenger side." (Tr. 682.) He thus argued the bullet could not have been fired by someone standing level with the vehicle from somewhere on the lot of Club Alexander's. Admitted into evidence, state's Exhibit 5-17 provides some support for the prosecutor's comments regarding the trajectory of the bullet. Given the latitude the parties possessed in commenting upon the evidence and the reasonable inferences that could be drawn from it, the trial court did not abuse its discretion in failing to sustain defendant's objections to the prosecutor's comments on the bullet's trajectory.

Defendant also contends the prosecutor improperly argued the shooting was motivated by defendant's having been belittled at Club Alexander's in front of Pankey, whom defendant "liked." Defendant contends no evidence in the record reveals the relationship between Pankey and himself, nor addresses what Pankey saw or heard that night.

After defendant objected, the prosecutor told the jury he did not mean to suggest defendant and Pankey had a romantic relationship, but only defendant liked Pankey in the sense the two were friends. Further, Alexander testified he saw Pankey leave the nightclub right behind defendant as defendant was being forced to leave, and Pankey appeared to be with him, suggesting Pankey witnessed at least part of the incident which angered defendant. As such, the trial court did not abuse its discretion in overruling defendant's objection to the

> prosecutor's comments especially given the latitude the parties have in commenting upon the evidence.
>
> Finally, the trial court instructed the jury at the beginning of the trial that opening statements and closing arguments were not evidence. When defendant objected to the prosecutor's comments regarding defendant and Pankey, the trial court reminded the jury that if any argument made by either party was inconsistent with the testimony and evidence, the members of the jury were to disregard it, since their verdict was required to be based on the evidence presented. Given all the foregoing, defendant was not deprived of a fair trial by the prosecutor's remarks. Accordingly, defendant's fourth assignment of error is overruled.

*State v. Chavis, supra; Exhibit 19 to Return of Writ.* Again, the decision of the state appellate court is presumed to be correct. 28 U.S.C. §2254(d), (e). Petitioner has failed to establish that the state appellate court's decision is so unreasonable as to warrant federal habeas corpus relief. *See Williams v. Taylor, supra.*

The scope of federal habeas corpus review of a claim of prosecutorial misconduct is narrow. A federal court does not sit as an appellate court employing supervisory powers to rectify ordinary trial error in cases before it for habeas review. *Donnelly v. De Christoforo,* 416 U.S. 63 (1974). Rather, the Court must consider only whether the prosecutor's conduct was so egregious as to deny the petitioner fundamental fairness. *Id.* at 642-43; *Martin v. Foltz,* 773 F.2d 711, 716-17 (6th Cir.1985); *Angel v. Overberg,* 682 F.2d 605, 607 (6th Cir.1982) ( *en banc* ). This determination is made by evaluating the totality of the circumstances surrounding the case. *Angel v. Overberg,* 682 F.2d at 607.

> This Court employs a two-part test to determine whether prosecutorial misconduct warrants a new trial. *United States v. Carter,* 236 F.3d 777, 783 (6th Cir. 2001) (citing *United States v. Carroll,* 26 F.3d 1380, 1385-87 (6th Cir. 1994)). "Under this approach, a court must first consider whether the prosecutor's conduct and remarks were improper," and "then consider and weigh four

32

> factors in determining whether the impropriety was flagrant and thus
> warrants reversal." *Id.* (citing *Carroll,* 26 F.3d at 1387). The four
> factors which this Court considers include:
>
> (1) whether the conduct and remarks of the prosecutor tended to
> mislead the jury or prejudice the defendant; (2) whether the conduct
> or remarks were isolated or extensive; (3) whether the remarks were
> deliberately or accidentally made; and (4) whether the evidence
> against the defendant was strong.

*Girts v. Yanai,* – F.3d –, 2007 WL 2481018 (6th Cir., September 5, 2007).

A prosecutor may argue reasonable inferences from the evidence, but must not misstate the evidence. *Macias v. Makowski*, 291 F.3d 447, 452 (6th Cir. 2002), citing *Byrd v. Collins*, 209 F.3d 486, 535 (6th Cir. 2000). Upon review of the record, this Court agrees with the conclusion of the state appellate court that the challenged prosecutor's comments were not improper. Further, and in view of the instructions issued by the trial court, petitioner was not so prejudiced by those statements as to justify federal habeas corpus relief.

Claim two is without merit.

## CLAIMS THREE, FOUR, AND FIVE

In claim three, petitioner asserts that the trial court improperly dismissed his petition for post conviction relief without conducting an evidentiary hearing. In claim four, petitioner asserts that he was denied due process and fair appellate review because the state appellate court improperly dismissed his post conviction petition as untimely. In claim five, petitioner asserts that he was denied due process because the state appellate court dismissed his post conviction appeal on procedural grounds when he made a "colorable claim of actual innocence." *Memorandum in Support of Petition*, at 3. None of these claims raise issues appropriate for federal habeas corpus review.

33

[T]he Sixth Circuit has consistently held that errors in post-conviction proceedings are outside the scope of federal habeas corpus review. *See Kirby v. Dutton,* 794 F.2d 245, 246-47 (6th Cir. 1986); *Roe v. Baker,* 316 F.3d 557, 571 (6th Cir. 2002). ... [C]laims challenging state collateral post-conviction proceedings "cannot be brought under the federal habeas corpus provision, 28 U.S.C. § 2254," because " 'the essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and ... the traditional function of the writ is to secure release from illegal custody.' " *Kirby,* 794 F.2d at 246 (quoting *Preiser v. Rodriguez,* 411 U.S. 475, 484, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973)); *see also Pennsylvania v. Finley,* 481 U.S. 551, 557, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987) ("States have no obligation to provide this avenue of relief, and when they do, the fundamental fairness mandated by the Due Process Clause does not require that the State supply a lawyer as well." (citation omitted)). A due process claim related to collateral post-conviction proceedings, even if resolved in a petitioner's favor, would not "result [in] ... release or a reduction in ... time to be served or in any other way affect his detention because we would not be reviewing any matter directly pertaining to his detention." *Kirby,* 794 F.2d at 247. "Though the *ultimate* goal in" a case alleging post-conviction error "is release from confinement, the result of habeas review of the specific issue[ ] ... is not in any way related to the confinement." *Id.* at 248. Accordingly, we have held repeatedly that "the scope of the writ [does not] reach this second tier of complaints about deficiencies in state post-conviction proceedings," noting that "the writ is not the proper means" to challenge "collateral matters" as opposed to "the underlying state conviction giving rise to the prisoner's incarceration." *Id.* at 248, 247; *see also Alley v. Bell,* 307 F.3d 380, 387 (6th Cir. 2002) ("error committed during state post-conviction proceedings can not [ *sic* ] provide a basis for federal habeas relief" (citing *Kirby,* 794 F.2d at 247)); *Greer v. Mitchell,* 264 F.3d 663, 681 (6th Cir. 2001) ("habeas corpus cannot be used to mount challenges to a state's scheme of post-conviction relief").

*Cress v. Palmer,* 484 F.3d 844, 853 (6th Cir. 2007).

Further, and to the extent that petitioner raises in this action an independent claim of actual

innocence, such claim is likewise not appropriately considered in these habeas corpus proceedings.

*Id.*, at 854, citing *Schlup v. Delo,* 513 U.S. 298, 314-17 (1995); *Herrera v. Collins,* 506 U.S. 390,

34

404 (1993); *Zuern v. Tate*, 336 F.3d 478, 482 n. 1 (6th Cir. 2003).

Therefore, claims three, four, and five are without merit.

For all the foregoing reasons, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED**.

If any party objects to this *Report and Recommendation*, that party may, within ten (10) days of the date of this report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s).  A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation*.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).


October 25, 2007                                                    s/Norah McCann King
                                                                     Norah McCann King
                                                              United States Magistrate Judge